UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID W. WILSON,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>STUART SHERMAN, et al.,<br><br>　　　　　Defendants. | Case No.: 1:22-cv-00874-JLT-SKO (PC)<br><br>**FINDINGS AND RECOMMENDATIONS REGARDING THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>(Docs. 61 & 81) |

Plaintiff David W. Wilson is appearing pro se and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. section 1983.

## I.   INTRODUCTION

On May 8, 2025, Plaintiff filed a motion for summary judgment. (Doc. 61.) Defendants opposed (Doc. 82), and Plaintiff replied (Doc. 87).

On December 11, 2025, Defendants filed a motion for summary judgment. (Doc. 81.) Plaintiff opposed (Doc. 86), and Defendants replied (Doc. 88).

## II.   APPLICABLE LEGAL STANDARDS

### *Motions for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by

"citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or shows that the materials cited by the movant do not establish the absence of a genuine dispute. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Further, the opposing party must also demonstrate that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P.

2

56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

### *Eighth Amendment: Conditions of Confinement*

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825 (1994); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Thus, no matter where they are housed, prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks & citations omitted). To establish a violation of the Eighth Amendment, the prisoner must "show that the officials acted with deliberate indifference ....." *Labatad v. Corrections Corp. of America*, 714 F.3d 1155, 1160 (9th Cir. 2013) (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002).

The deliberate indifference standard involves both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer*, 511 U.S. at 834. Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." *Id.* at 837; *Anderson v. County of Kern*, 45 F.3d 1310, 1313 (9th Cir. 1995).

Objectively, extreme deprivations are required to make out a conditions of confinement claim and only those deprivations denying the minimal civilized measure of life's necessities are

sufficiently grave to form the basis of an Eighth Amendment violation. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Although the Constitution "'does not mandate comfortable prisons,'" *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)), "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time," *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989). Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise -- for example, a low cell temperature at night combined with a failure to issue blankets. *Wilson*, 501 U.S. at 304-05 (comparing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) [outdoor exercise required when prisoners otherwise confined in small cells almost 24 hours per day] with *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980) [outdoor exercise not required when prisoners otherwise had access to dayroom 18 hours per day]). To say that some prison conditions may interact in this fashion is far from saying that all prison conditions are a seamless web for Eighth Amendment purposes. *Id.* Amorphous "overall conditions" cannot rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists. *Id.* Further, temporary conditions of confinement do not necessarily rise to the level of constitutional violations. *See Anderson*, 45 F.3d at 1314-15, citing to *Hoptowit v. Ray*, 682 F.2d 1237, 1258 (9th Cir. 1982) (*abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995) (in evaluating challenges to conditions of confinement, length of time the prisoner must go without basic human needs may be considered)).

Subjectively, if an objective deprivation is shown, a plaintiff must show that prison officials acted with a sufficiently culpable state of mind, that of "deliberate indifference." *Wilson*, 501 U.S. at 303; *Labatad*, 714 F.3d at 1160. "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not,

4

then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson*, 290 F.3d at 1188). To prove knowledge of the risk, however, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. *Farmer*, 511 U.S. at 842; *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).

The Supreme Court held that "extreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' 'only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citations omitted).

### III.    THE FACTUAL ALLEGATIONS & SCREENING FINDINGS

The following facts were alleged in Plaintiff's second amended complaint:

> Plaintiff contends that on June 6, 2019, he sent three requests for interviews to Defendants Sherman, Williams and Lines "to correct constitutional deprivations." (Doc. 26 at 3.) These requests concerned swamp coolers, and ventilation issues in Building 1, Facility B. (*Id*. at 3-4.) Plaintiff alleges Defendant Collins responded for Defendant Lines on June 11, 2019, indicating a work order was in the system and Plaintiff should resubmit "to custody." (*Id*. at 4.) Plaintiff responded the following day, indicating he was dissatisfied. (*Id*.) On June 12, 2019, Plaintiff filed a health request and was seen by a medical doctor for dizziness and headaches attributable to the heat. (*Id*.)
>
> Plaintiff contends that on June 14, 2019, a counselor responded for the warden stating SATF has an institutional heat plan which will continue to be followed. (Doc. 26 at 4.) Plaintiff contends this response was false and that the heat plan is not recorded accurately, resulting in a denial of cooling measures. (*Id*.) Plaintiff asserts the warden is responsible for policy inaction and can respond to constitutional violations. (*Id*.)
>
> On June 17, 2019, Defendant Leahy indicated a work order had been submitted to have plant operations look at the swamp coolers in Building 1, plant operations was aware the swamp coolers were not working and the parts to fix the problem were on order. (Doc. 26 at 5.) Leahy also indicated portable swamp coolers were not available and that stand-up fans were provided. (*Id*.) Plaintiff contends this response is false because the stand-up fans were "diverted" by staff (*Id*.) Plaintiff asserts Leahy is responsible for this "omission to correct constitutional violations" and was aware and on notice from his grievance. (*Id*.) Plaintiff alleges that on June 17, 2019, he sent a "Letter Coleman Attorney's of above." (*Id*.) Plaintiff asserts a

meeting with the Inmate Advisory Committee ADA Chairman and Defendant Smith resulted in medically qualified ADA inmates being allowed ice and ice water if temperatures reached 90 degrees "stage two." (*Id.*) Plaintiff alleges that on July 17, 2019, he "received Request from Captain Williams without response" as required by regulation. Plaintiff states Williams is responsible for "inaction & omissions to correct deprivations & can respond …." (*Id.*)

Plaintiff contends he filed a "Group Class" grievance on August 29, 2019, regarding portable swamp coolers, water fountains, and cooling measures. (Doc. 26 at 5.) On September 27, 2019, Plaintiff received a first level response from Defendants Rocha and Marsh, granting staff compliance "May through Oct. 31st or whenever temp warrant." (*Id.*) The response advised water fountains were working properly and denied Plaintiff's request for portable swamp coolers. (*Id.*) Plaintiff contends Rocha and Marsh are responsible for and can respond to "inaction of policy omitted for heat & ADA violation." (*Id.*)

On October 15, 2019, Plaintiff replied to the first level response, stating the water fountains were not producing cold water, and were corroded and in need of repair. (*Id.* at 5-6.) He states this is health hazard, the temperatures in the dorm areas were higher than the open dayroom due to overcrowding and the correctional officers had denied "equal cooling." (*Id.* at 6.) Plaintiff alleges discrimination and states the heat plan was not being adhered to due to a lack of training for staff. (*Id.*)

The December 10, 2019, the second level response by Defendant Collins on behalf of the warden indicated the facility was following the heat plan, the water fountains were working properly, and denied portable swamp coolers. (Doc. 26 at 6.) Plaintiff contends "Collins and Warden Sherman" are responsible for and can respond to omissions to correct policy of inadequate heat conditions and constitutional violations. (*Id.*) Plaintiff replied on December 17, 2019, expressing his dissatisfaction. (*Id.*)

Plaintiff contends that on January 3, 2020, the warden posted a memorandum concerning the wastewater treatment plan at California State Prison, Corcoran and a sewage overflow or spill, stating the project or repair did not involve SATF. (Doc. 26 at 6.) Plaintiff appears to allege such sewage water is "used for drinking water." (*Id.*)

On April 2, 2020, Plaintiff received the third level response from the Office of Appeals stating that due to time constraints, the second level response would serve as the final decision. (Doc. 26 at 6-7.) The document was not signed. (*Id.*) Plaintiff contends the Office of Appeals "responds for" the Director of Adult Institutions "who responds to CDCR Secretary who is responsible for all prisons including SATF." (*Id.* at 7.) Plaintiff states his grievance to the third level was timely and that the Office of Appeals response was a "false statement to allow continual cruel punishments." (*Id.*)

6

On June 28, 2022, Plaintiff submitted a grievance concerning black mold in the facility's toilet and shower areas and dorm areas. (Doc. 26 at 7.) He noted overcrowding and a lack of an appropriate number of toilets for the population and for those with disabilities. (*Id*. at 7-8.) Plaintiff contends he was interviewed by Defendant Florez on August 25, 2022. (*Id*. at 8.) Florez stated there was no black mold in the shower areas, but the area needed cleaning. (*Id*.) While Florez was present, other inmates called out to him that there was "mold … up here on wall next to" their bunks. (*Id*.) Plaintiff contends Florez was on notice and that his omission to correct constitutional deprivations is discriminatory. (*Id*.)

On August 31, 2022, Plaintiff alleges he "received DECISION Black MOLD, denied S. Smith, A.W. Reviewing Authority for Warden [Cisneros]," denying his grievance concerning black mold. (Doc. 26 at 8.) It stated staff did not violate policy. (*Id*.) Plaintiff asserts Defendants Smith and Cisneros were on notice and took no action. (*Id*.) Plaintiff appealed to the next level, alleging the response was false, that Defendant Florez "interviewed C-Sec. Yet! went to other Sec's as" building cameras would show, and Florez did not have protective equipment or gear, did not take any took kit or swabs for samples and no video was taken. (*Id*.) Plaintiff's appeal was denied by the Office of Appeals on December 10, 2022, with regard to black mold or mildew, lack of housekeeping, and toilet per inmate ratios in light of inmate population. (*Id*. at 8-9.) Plaintiff contends the grievance was "granted" because the Office of Appeal was "unable to determine by a [preponderance] of evidence that all policies are being followed." (*Id*. at 9.)

On January 23, 2023, Plaintiff filed a health request for cough drops and antibiotics because ten days of rain caused black mold to "infect A-Section or by virus." (Doc. 26 at 9.) Plaintiff was seen for a sore throat and cough and was provided medication. (*Id*.)

On February 13, 2023, Plaintiff "gave request" to a building officer for two work orders to replace air filters in swamp coolers, remove dust from pipes and air ducts, registers and vents, and from windows and the ceiling. (Doc. 26 at 9.) He notes almost all inmates in that section were coughing and had sore throats from dust or black mold in the "roof infrastructure with other pathogens." (*Id*.) Plaintiff added an affidavit with 19 signatures to that grievance on February 20, 2023. (*Id*.) The grievance was denied on March 14, 2023, by "R. Morales Reviewing Authority for constitutional violations for Warden Phillips." (*Id*.) Plaintiff contends Defendants "can respond" and are responsible for omissions to correct health and safety policy violations. (*Id*.)

On March 19, 2023, Plaintiff responded to the denial of the grievance, alleging feather dusters on long poles used by porters cannot clean years of dirt, soot, and carbon monoxide build up, and that a vacuum or power wash was required to correct the problem. (Doc. 26 at 9-10.) On April 11, 2023, Plaintiff sent a letter to "OSAH [sic] Washington CD" requesting an investigation. (*Id*.) That agency responded that they had forwarded his request to "CAL/OSHA" in Oakland, California. (*Id*.)

7

> In a May 31, 2023, Office of Appeals response, Director Moseley granted "IV. REMEDY" and indicated SATF "shall open a new grievance log number, gather & preserve all relevant information, & provide a response" concerning the subject matter of the grievance and assertions of inadequate cleaning. (Doc. 26 at 10.) Plaintiff contends "Plant Ops came" and cleaned the exhaust vents, openings and overhead lights. (*Id*.) When Plaintiff asked why the overhead water pipes were not cleaned, a stationary engineer stated that was a job for "plumbing" and they were "HVAC." (*Id*.) Plaintiff asked about vacuuming the ceiling because "they had" a vacuum cleaner on an electric lift. (*Id*.) Plaintiff contends the engineer stated that "was another" work order. (*Id*.)
>
> On July 3, 2023, Plaintiff received a second level response to the grievance from Defendant Marsh. (Doc. 26 at 10.) It was granted as to "IV. REMEDY," and noted a work order was generated and completed on June 23, 2023, for "the cleaning of the ducting system." (*Id*.) Plaintiff states Marsh denied "complete action" and that Marsh and Phillips "can respond for inaction to correct policy effecting safety & health." (*Id*.)

(*See* Doc. 29 at 5-9, fns. omitted.) Considering the Eighth Amendment conditions of confinement claim, the Court determined as follows:

> Here, liberally construing the second amended complaint, Plaintiff plausibly alleges Eighth Amendment conditions of confinement claims against the named Defendants. Plaintiff alleges sufficiently serious violations in the form of inadequate ventilation and cooling, and the presence of black mold. *Farmer*, 511 U.S. at 834; *Board v. Farnham*, 394 F.3d 469, 486 (7th Cir. 2005) (holding that the plaintiffs' allegations regarding inadequate ventilation was sufficient to constitute an objectively serious harm); *Knight v. Elko County*, No. 3:22-cv-00433-ART-CSD, 2022 WL 20471410, at *4 (D. Nev. Dec. 5, 2022) (finding colorable Eighth Amendment conditions of confinement claims at screening for failure to address ongoing black mold problem); *Johnson v. Gentry*, No. 2:19-cv-00232-MMD-NJK, 2019 WL 13195239, at *4 (D. Nev. Feb. 12, 2019) (finding "colorable conditions of confinement claims against Defendants Williams, Gentry, Cox, and Dzurenda because they allegedly knew of unsafe conditions (a filthy and vermin-infested cell and black mold in the showers) but refused to remedy the situation). At this stage of the proceedings, the Court also finds Plaintiff's assertions concerning Defendants' knowledge of the risk to be sufficient. Plaintiff has alleged conditions involving obviousness and asserts he submitted several grievances on these issues, some of which were acted upon in a partial capacity or resulted in an interview and inspection. *Farmer*, 511 U.S. at 842; *Wallis*, 70 F.3d at 1077; *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013 ("[O]bviousness is not measured by what is obvious to a layman, but rather by what would be obvious in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved" [citations omitted]); *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir.

2011) ("acquiescence or culpable indifference" may suffice to show that a supervisor "personally played a role in the alleged constitutional violations").

In sum, liberally construing the second amended complaint, Plaintiff plausibly alleges Eighth Amendment conditions of confinement claims against the named Defendants

(*Id*. at 12-13.)[1]

### IV.    SUMMARY OF THE PARTIES' BRIEFING[2]

***Plaintiff's Motion for Summary Judgment (Doc. 61)***

Plaintiff appears to argue that he has exhausted his administrative remedies[3] and is entitled to summary judgment as a matter of law.[4]

---

[1] The Court "also determined that amendment would be futile as to Plaintiff's ADA/RA and Fourteenth Amendment [Equal Protection Clause] claims" and recommended the action proceed only on Plaintiff's Eighth Amendment conditions of confinement claims. (*Id*. at 13-17.)

[2] In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection.

[3] The Court issued Findings and Recommendations to Deny Defendants' Motion for Summary Judgment re Exhaustion on March 17, 2026. (Doc. 90.) It noted that Defendants acknowledged that Plaintiff's claims against the remaining defendants were indeed exhausted. (*Id*. at 5, fn. 2.) Further, the Court stated: "Defendants' summary judgment motion concerns the exhaustion of administrative remedies regarding Plaintiff's claims against Leahy and Lines only." (*Id*. at 14-15.) On April 2, 2026, District Judge Jennifer L. Thurston issued an Order Adopting Findings and Recommendation to Deny Defendants' Motion for Summary Judgment re Exhaustion, (doc. 91), and the Court will not address the fully resolved issue of exhaustion.

[4] Plaintiff's motion is comprised of approximately 23 pages of argument and includes 224 pages of exhibits. The exhibits include health care services request forms, a 2014 consumer confidence report, inmate request for interview forms, CDCR Facilities Management Division Design Criteria Guidelines, memoranda, correspondence directed to Plaintiff, a heat risk medications list, CDCR Heat Plan Monthly Summary Report form, inmate grievances or appeals and related documents, Institution Heat Plan, Inmate Heat-Risk Pass forms, CDCR and SATF Inside Temperature Record forms, Heat Incident Log forms, a Kings County Superior Court Order Re: Petition for Writ of Habeas Corpus in case number 20W0035D, a denial order issued by the Fifth District Court of Appeal in case number F082239, a motion filed by Plaintiff in case number CIV-S-90-0520-KJM-DMB P before the Eastern District and case number C-01-01351-JST before the Northern District and related correspondence, minutes from an Inmate Advisory Council meeting, state regulations concerning "Reporting to the Local Health Authority," a document titled "Corcoran 2022 Drinking Water Report," excerpts from a Walkenhorst catalog, classification related documentation, Correctional Counselor I and Correctional Captain job descriptions, a medical order pertaining to Plaintiff dated 2/29/2024, and various sections of Title 15 of the California Code of Regulations.

Defendants' Opposition[5]

Defendants summarized Plaintiff's summary judgment motion as follows:

> Plaintiff argues that SATF Facility B, Building 1's airflow was inadequate due to its design capacity. (ECF No. 61 at 4-5.) Temperatures within the building reached 80 to 90 degrees, but dorm/bedroom areas were 10 degrees hotter than in the dayroom. (*Id*.) Correctional staff denied cooling measures provided to similarly situated inmates. (*Id*. at 5.) Buildings 1 and 2 did not receive portable swamp coolers like Building 3 received. (*Id*.) Correctional staff denied Building 1 ice, iced drinks, and working cold water fountains. (*Id*.) Correctional staff sat in separate offices with sealed windows while cold air was denied to crowded dorms. (*Id*.) This overcrowding on the upper and lower tiers caused excessive heat and humidity. (*Id*.) These conditions affected inmates using walkers, C-PAP machines, and wheelchairs. (*Id*.) This heat caused Plaintiff to have dizziness and tension headaches. (*Id*.)
>
> Plaintiff also argues that black mold existed in the building's showers, toilets, walls, bed areas, and behind wall lockers in each pod. (*Id*.) Correctional staff were aware and simply painted over the mold. (*Id*.) The mold caused Plaintiff to develop a cough, sore throat, and chest pains. (*Id*.) Plaintiff also alleges the water was contaminated, the building was dusty, lacked adequate HEPA filters, and overall, and not ADA compliant. (*Id*.)

(Doc. 82 at 1-2, fn. omitted.) Defendants contend Plaintiff's 2019 claims regarding ventilation and cooling are barred by res judicata (*id*. at 6-8), that Plaintiff cannot establish the conditions posed a substantial risk of serious harm to his health (*id*. at 8-9), that Facility B, Building 1's temperatures did not exceed ninety degrees between May and October 2019 (*id*. at 9-10), that Plaintiff fails to establish any black mold existed in his building in 2022 (*id*. at 11), that Plaintiff fails to establish Defendants were aware of an excessive risk of harm to Plaintiff's health (*id*. at 11-12), and that Defendants are entitled to qualified immunity (*id*. at 12-15).

Plaintiff's Reply

Plaintiff's reply includes "Plaintiff's Exception and Denial Defendants Undisputed Material Facts in Opposition Plaintiffs Motin for Summary Judgment" (Doc. 87 at 3-17), a statement concerning SATF's heat plan (*id*. at 17-18), the legal standards applicable to summary judgment (*id*. at 18-19), and arguments that his claims are not barred by res judicata (*id*. at 19-21),

---

[5] Defendants' opposition is 291 pages long.

that he and "group class" have established conditions in B Facility pose an ongoing substantial risk of serious harm (*id*. at 21-22), that Defendants are not entitled to qualified immunity (*id*. at 22-24) and that his mold related claims "must attach Defendants for denial equal protection" (*id*. at 24-25). Included as exhibits are Plaintiff's "Denial and Exception to the Informal Response and Memorandum of Points and Authorities in Support Thereof" in Kings County Superior Court case number 20W0035D (*id*. at 27-31) and that court's Order Re: Petition for Writ of Habeas Corpus filed December 14, 2020 (*id*. at 32-34), as well as the Fifth District Court of Appeal's order denying his "'Petition for Review Habeas Corpus …'" in case number F082239 (*id*. at 35).

### *Defendants' Motion for Summary Judgment (Doc. 81)*

Defendants contend they are entitled to summary judgment because Plaintiff's 2019 claims concerning ventilation and cooling are barred by res judicata (Doc. 81 at 12-14), that Plaintiff cannot establish the conditions in his housing facility posed a substantial risk of serious harm to his health (*id*. at 14-18), and that they are entitled to qualified immunity (*id*. at 18-21).

### Plaintiff's Opposition

Plaintiff contends his 2019 claims are not barred by res judicata "for breach of primary right and duty & harm suffered" (Doc. 86 at 20-22), that he and "group class" established the conditions in B Facility pose an ongoing "substantial risk to serious harm and health that's imminent danger" (*id*. at 22-23), and that Defendants are not entitled to qualified immunity (*id*. at 23-26). He also includes more than 300 pages of exhibits. (*Id*. at 45-348.)[6]

### Defendants' Reply

Defendants contend Plaintiff's evidence outside the scope of this litigation is irrelevant (Doc. 88 at 2-3), Plaintiff's 2019 claims are barred by res judicata (*id*. at 3-4), Plaintiff cannot establish conditions in Facility B, Building 1 posed a substantial risk of serious harm to Plaintiff's health (*id*. at 4-7), and that they are entitled to qualified immunity (*id*. at 7).

//

//

---

[6] The Court will not recite the exhibit contents for purposes of judicial economy. Suffice to say, the exhibits are largely repetitive of previous submissions.

11

## V. PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS[7]

1. Plaintiff arrived at the California Substance Abuse Treatment Facility (CSATF) on January 28, 2019; within two weeks, he experienced uncontrolled urinating and defecating caused by contaminated water, black mold, and inadequate ventilation.

2. On June 6, 2019, Plaintiff sought interviews with prison officials to address extreme temperatures and ventilation, swamp coolers, and cooling measures.

3. On June 11, 2019, a response on behalf of Jan Lines indicated a work order was in the system.

4. On June 12, 2019, following submission of a health request, Plaintiff was treated for dizziness and severe tension headaches and requested cooling measures.

5. On June 14, 2019, a response on behalf of CSATF's warden indicated staff would continue to follow the heat plan and to provide measures to prevent heat related illness. Plaintiff believes this is a false statement because the "heat plan is not recorded accurately to deny cooling measures …."

6. On June 17, 2019, Sgt. Leahy responded to Plaintiff's concerns regarding swamp coolers, indicating that parts had been ordered for repairs, that portable swamp coolers were not an option, and that two fans had been placed in the facility. Plaintiff asserts this is false because the fans in the facility "had been cut-off completely & diverted" by prison staff.

7. On June 17, 2019, Plaintiff sent a letter to "Coleman" attorneys regarding his concerns.

8. On July 17, 2019, Plaintiff "received request from Captain Williams … without response.

9. On August 29, 2019, Plaintiff filed a group class grievance seeking portable swamp coolers, repairs to cold water fountains, and cooling measures in compliance with the heat plan.

---

[7] Plaintiff's "Statement Jf Genuine Undisputed Facts" has been modified for clarity and brevity.

12

10. The September 27, 2019, first level response was granted in part, stating facility staff complied with the heat plan between May and October and that drinking fountains produced and dispensed cold fresh water; it was denied regarding portable swamp coolers.

11. On October 15, 2019, Plaintiff appealed to the next level.

12. On December 10, 2019, Plaintiff received the second level response, mirroring that given in the first level.

13. On December 17, 2019, Plaintiff appealed to the third level, addressing contaminated water, his excessive urination and need for diapers, and assertion that portable swamp coolers provide heat relief and prevent black mold.

14. On January 3, 2020, the warden "posted [a] memo" concerning a wastewater treatment plant project to commence at California State Prison, Corcoran.

15. On April 2, 2020, Plaintiff received the third or final level response, indicating the second level response served as the final appeal decision.

16. On March 10, 2020, Plaintiff received unsigned communication from the Office of Appeals and states "OOA false statement to deny 1st Amend exhaustion court access & continual 8th Amend."

17. On June 24, 2020, Plaintiff filed a petition for writ of habeas corpus in "superior ct.," concerning "ADA, mold growth & over-crowding;" it was denied.[8]

18. On January 8, 2021, Plaintiff filed a "Petition for Review CA Court of Appeal" that was denied on April 27, 2021.

19. Plaintiff filed an action in the United States District Court for the Northern District that was transferred to this Court and assigned case number 1:19-cv-00970-DAD-

---

[8] To the extent Plaintiff references Eighth Amendment conditions of confinement claims other than his claims concerning inadequate ventilation and cooling or black mold (e.g., overcrowding) the Court does not address them because such claims are not before the Court. (*See* Doc. 29 at 12 ["Plaintiff plausibly alleges Eighth Amendment conditions of confinement claims against the named Defendants. Plaintiff alleges sufficiently serious violations in the form of inadequate ventilation and cooling, and the presence of black mold"].)

13

GSA. The action was ultimately closed on August 26, 2021.[9]

20. On June 28, 2022, Plaintiff sought the removal of black mold from various facility areas, relief from overcrowding, access to additional toilet facilities, and relief from a lack of ventilation.

21. Plaintiff interviewed "F. Florez, [Hazardous Materials Specialist] on August 25, 2022. Florez did not find black mold and stated the areas just needed cleaning.

22. On August 31, 2022, Plaintiff received a denial from the facility's grievance office, noting Florez's explanation that mildew rather than black mold was present and that bathrooms and bunk areas conformed to applicable requirements.

23. On September 1, 2022, Plaintiff appealed to the second level, adding Florez did not have protective equipment, a tool kit, swabs or scrapers for obtaining samples, and that no video was taken.

24. Also on September 1, 2022, Plaintiff filed a grievance concerning "HEPA filtration" and requested a transfer to "Chino D-Fac." or a single cell in "CMF Unit's T, U, V." It was denied on October 19, 2022, and Plaintiff sought further review and requested single cell states based on incontinence.

25. On December 10, 2022, Plaintiff received the third level response concerning the issue of black mold; the grievance was denied as to black mold and a lack of housekeeping. Further information was required concerning Plaintiff's claims of overcrowding.

26. On January 23, 2023, Plaintiff filed a health care request form seeking cough drops and antibiotics due to rain causing "black mold to infect A-Sec. or by virus." The medical provider prescribed medication to treat sore throat and cough.

27. On February 20, 2023, Plaintiff filed a grievance, accompanied by a supporting affidavit, concerning dust in or around overhead water pipes, air ducts, exhaust vent openings, windows and roof infrastructure. He sought its removal. The grievance was

---

[9] In fact, the case was dismissed on February 20, 2020, without prejudice, due to Plaintiff's failure to comply with a court order, failure to pay the filing fee, and failure to prosecute. (No. 1:19-cv-00970-DAD-GSA, Docket Entry No. 18.)

denied at the first level on March 14, 2023.

28. On March 19, 2023, Plaintiff appealed to the next level.

29. On April 11, 2023, Plaintiff sent a letter to "OSAH Washington DC for Investigation" and to "CAL/OSHA Calif. Div. of OSHA, Oakland CA."

30. On May 4, 2023, Plaintiff's grievance concerning "HEPA filtration" was granted, as was his request for single cell status "due to the need to change incontinent diapers."

31. On May 31, 2023, the OOA granted Plaintiff's earlier grievance and directed CSATF to assign a new log number and to provide a response concerning alleged inadequate dust removal.

32. In a response dated June 26, 2023, the facility's plant operations cleaned exhaust vents and openings and overhead lights, but not the overhead water pipes. Plaintiff was advised by the HVAC stationary engineer that "PLUMBING" was responsible for that work, and that "another work order" was necessary for vacuuming the ceiling and cleaning the windows.

33. On July 3, 2023, the grievance office found that cleaning of the ducting system was completed on June 23, 2023.

34. On July 6, 2023, Plaintiff appealed to the next level. (As best the Court can discern, the OOA ordered further cleaning measures be taken to remove dust from the overhead pipes and windows).

35. On August 17, 2023, Plaintiff filed a grievance alleging "extreme heat deprivation" and requested replacement of air conditioning units to improve ventilation.

36. In September 2023, the warden issued a decision indicating the facility had complied with the remedies previously granted.

37. On September 10, 2023, Plaintiff filed a grievance concerning contaminated water involving "recycle sewage water" causing excessive "urinating & defecating," and requesting an independent review.

38. The grievance was denied at the institutional level on October 6, 2023. The denial stated that "portable water systems & sewer systems are 2 independent systems & are

15

not connected."

39. Plaintiff appealed to the next level on October 12, 2023, asserting the institutional finding was false.

40. On December 11, 2023, the OAA determined there was "no applicable remedy" because the contaminants in City of Corcoran water were below maximum standards.

41. On July 16, 2024, Building 3 "was given big black swamp cooler" but Buildings 1 and 2 did not receive a swamp cooler due to favoritism. Between July 22 and July 26, 2024, all three buildings had large standing oscillating fans.

42. On November 5, 2024 (as best the Court can discern), Plaintiff filed a grievance concerning a counselor's refusal to move him to a single cell. The grievance was denied at the institutional level on an unspecified date.

43. On January 5, 2025, Plaintiff appealed to the next level, with Plaintiff noting a nurse practitioner stated it was "custody issue & ignored shown CDCR Memo 1/19/2016 …."

44. On March 19, 2025, Plaintiff received an "OOA Decision GRANTED" concerning an unspecified grievance.

45. On February 7, 2025, a memorandum concerning notification of positive Legionella[10] cases at CSATF was posted in Facility B. It listed symptoms including cough, fever, headache, muscle aches, shortness of breath, nausea, confusion, and diarrhea.

46. On March 12, 2025, Plaintiff submitted a health request due to a sore throat seeking throat lozenges.

47. The following day, Plaintiff was called to the clinic but he refused to see "Nurse C. Stronic for grievance(s) against her and legal actions where she retaliates by placing blood-pressure cuff intentionally tight cutting-off circulation."

---

[10] "Legionnaires' disease is a serious type of pneumonia caused by *Legionella* bacteria" that is "treatable with antibiotics" and "[i]n general, it isn't spread person to person." https://www.cdc.gov/legionella/about/index.html, last accessed 4/3/2026.

48. On March 14, 2025 (as best the Court can discern), Plaintiff received a message via Tablet "dated 3/14/2025, for 3/10/2025, Subject: UPDATED same as above Memorandum February 7, 2025."

49. On April 29, 2025, Plaintiff received an OOA decision dated August 27, 2024, indicating time had expired concerning his grievance addressing dust removal; Plaintiff exhausted his administrative remedies.

(Doc. 61 at 6-19.)

Defendants objected to Plaintiff's undisputed facts as follows:

Irrelevant (Fed. R. Evid. 401):

> 1, 7, 14, 17, 18, 19, 24, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49

Unauthenticated/Lacks Foundation (Fed. R. Evid. 901):

> 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37, 38, 39, 40, 42, 43, 44, 45, 46, 47, 48, 49

Does Not Raise Triable Issue of Material Fact (*Anderson*, 477 U.S. at 248):

> 1, 7, 8, 11, 13, 14, 16, 17, 18, 19, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49

(Doc. 82-2.)

## VI.    DEFENDANTS' STATEMENT OF UNDISPUTED FACTS[11]

1. At all times relevant to the Second Amended Complaint, Plaintiff David W. Wilson (CDCR No. K-66474) was an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR) and was housed at the California Substance

---

[11] Declarations in support include those of J. Barba, SATF Correctional Counselor II/Litigation Coordinator/Heat Plan Coordinator (Doc. 81-6), former SATF Associate Warden S. Marsh (Doc. 81-7), SATF Correctional Sergeant E. Rocha (Doc. 81-8), SATF Correctional Sergeant J. Leahy (Doc. 81-9), SATF Chief Medical Execute Dr. G. Ugwueze (Doc. 81-10), SATF Correctional Plant Manager II J. Lines (Doc. 81-11), SATF Associate Warden/Chief Deputy Warden S. Smith (Doc. 81-12), former SATF Correctional Captain/Acting Associate Warden-Complex 1 A. Williams (Doc. 81-13), former SATF Chief Deputy Warden/Warden T. Cisneros (Doc. 81-14), former SATF Warden S. Sherman (Doc. 81-15), former SATF Associate Warden J. Collins (Doc. 81-16), former SATF Warden B. Phillips (Doc. 81-17), SATF Associate Hazardous Materials Specialist F. Florez, Jr. (Doc. 81-18), SATF Associate Governmental Program Analyst for Plant Operations L. Leasure (Doc. 81-19), former SATF Chief Deputy Warden R. Morales (Doc. 81-20), and Deputy Attorney General Erick J. Rhoan (Doc. 81-21).

Abuse Treatment Facility and State Prison (SATF) in Corcoran, California. (Rhoan Decl. ¶ 2, Ex. A, Videoconference Deposition of David Wayne Wilson (Wilson Depo.), 5:8-13, 12:10-19, April 9, 2025; Pl's Second Am. Compl., ECF No. 26 at 1.)

2.  At all times relevant to the Second Amended Complaint, Wilson was housed in Facility B, Building 1 of SATF, assigned to the lower tier. (Wilson Depo. 13:4-7, 16:7-8; see generally ECF No. 26; Barba Decl. ¶ 9.)

3.  Facilities A and B of SATF have a dormitory design and are part of the same complex—Complex I. Facilities A and B have the exact same layout and each facility has three buildings. Each building has three "pods" identified as A, B, and C. Each pod has two tiers (upper and lower level) and each tier is divided into three "quads" holding seven bunk beds that accommodate fourteen inmates. (Barba Decl. ¶ 8.)

4.  Pursuant to *Coleman v. Newsom*, Eastern District of California Case No. CIV-S-90-0520, SATF enacted an Institutional Heat Plan via Operational Procedure No. 207 ("OP 207") to identify inmates who are, or who may be, susceptible to heat-related illnesses and provide measures to prevent heat-related illnesses. (Barba Decl., at ¶¶ 2-3 & Exh. A at DOJ00001.)

5.  Heat risk inmates are defined as those prescribed any of the medications listed on the Heat Alert Medication List in all forms or strengths. (Barba Decl., at ¶ 2 & Exh. A at DOJ00002, 18.)

6.  Under OP 207, both outside and inside temperatures are monitored from May 1 through October 31 of each year. (Barba Decl., at ¶ 4 & Exh. A at DOJ00001.)

7.  Stage I of the Heat Plan only concerns outside air temperature readings and is implemented when outside temperatures reach 90 degrees Fahrenheit. (Barba Decl., at ¶ 4 & Exh. A at DOJ00007-09.)

8.  Stage II of the Heat Plan activates when indoor temperatures reach 90 degrees. (Barba Decl., at ¶ 4 & Exh. A at DOJ00009-10.)

9.  When Stage II of the Heat Plan is implemented, a Correctional Food Manager or Supervising Correctional Cook must deliver containers of iced water to the housing

18

units for inmates identified as heat-risk inmates. (Barba Decl., at ¶ 4 & Exh. A at DOJ00009.)

10. In addition, when the inside recorded air temperature of the housing unit is 90 degrees Fahrenheit or more, heat-risk inmates must be afforded access to showers and/or spray bottle misting. (Barba Decl., at ¶ 4 & Exh. A at DOJ00009.)

11. When the dayroom air temperature of a facility's housing unit reaches 90 degrees Fahrenheit and goes into Stage II Heat Alert, one floor fan will be placed in each dayroom section. (Barba Decl., at ¶ 4 & Exh. A at DOJ00009.)

12. The Heat Plan required the inside air temperature of each non-air-conditioned housing unit be recorded on the highest tier to which a heat-risk inmate was assigned, using an accurate thermometer. (Barba Decl., at ¶ 5 & Exh. A at DOJ00005, 020.)

13. The Heat Plan also required the inside air temperature be monitored and logged every three hours on an Inside Temperature Record Log (CDCR form 2031). (Barba Decl., at ¶ 5 & Exh. A at DOJ00005, 020.)

14. According to the heat logs for Plaintiff's assigned housing unit, the inside temperature did not reach or exceed the 90-degree Fahrenheit threshold. (Barba Decl., ¶¶ 7-9 & Exh. B at DOJ00030-55; Marsh Decl., at ¶¶ 4-7.)

15. Stage II of the Heat Plan was never activated and cooling measures would not have been required for heat-risk inmates housed in Plaintiff's assigned housing unit. (Barba Decl., ¶ 9 & Exh. B at DOJ00030-55.)

16. During the relevant timeframe mentioned in the SAC, Facility B, Building 1's evaporative coolers were functioning at the manufacturer's designed criteria guidelines and the ideal temperatures for the housing units ranged from 68 to 89 degrees Fahrenheit. (Rocha Decl., at ¶ 5.)

17. The drinking fountains were also working properly. (Rocha Decl., at ¶ 6.)

18. Additionally, in the summer months of 2019, swamp coolers and igloo containers with ice water were provided to the inmates as a courtesy during repairs despite temperatures not reaching 90 degrees. (Collins Decl., at ¶¶ 4-12; Sherman Decl., at ¶

19

7.)

19. The Heat Plan was consistently followed during the relevant time period and Plaintiff's building did not pose a threat to his health. (Cisneros Decl., at PP 4-8; Leahy Decl., PP 4-7; Sherman Decl., at PP 4-11; Smith Decl., at PP 4-7; Ugwueze Decl., at PP 8-19; Williams Decl., at PP 4-8.)

20. Several maintenance work orders in Facility B, Building 1 were fulfilled during the relevant timeframe. (Florez Decl., at PP 6-7; Leasure Decl., at P 3.)

21. On March 12, 2019, a work order was issued to fix vents that were blowing hot air. This repair was completed on March 27, 2019. (Leasure Decl., at P 3 & Exh. A.)

22. On May 31, 2019 and July 26, 2019, respectively, work orders were issued to fix ventilation issues. These repairs were completed on August 7, 2019. (Leasure Decl., at P 3 & Exh. B.)

23. On May 16, 2019, a work order was issued to fix cold water push-buttons for the building's plumbing. This repair was completed on May 28, 2019. (Leasure Decl., at P 3 & Exh. C.)

24. On August 31, 2020, a work order issued to fix the building's HVAC, which was completed on September 17, 2020, due to some parts being out of stock. (Leasure Decl., at P 3 & Exh. D.)

25. In August 2022, in response to Plaintiff's grievance about black mold, Defendant Florez, who is an Associate Hazardous Materials Specialist, inspected the first tier of Facility B, Building 1. (Florez Decl., at PP 1, 6.)

26. Defendant Florez discovered that what was perceived as black mold was mildew created from dust and moisture mixing together. (Florez Decl., at P 6 & Exh. A.)

27. On or about November 23, 2022, Defendant Florez inspected the building's showers and did not find any black mold, only soap scum. (Florez Decl., at P 7 & Exh. B.)

28. Defendant Florez has also completed regular testing for black mold since 2015, which have all come back negative, and he has found no evidence of such mold at the prison. (Florez Decl., at P 8.)

20

29. In 2019, Plaintiff was not prescribed any medication listed in OP 207's Heat Alert Medication Listed. (Ugwueze Decl., at ⸿ 8; Barba Decl., Exh. B; Wilson Depo., at 18:19-25, 19:5-10, 33:2-4.)

30. Plaintiff testified at his deposition that he did not know if his symptoms were caused by heat or mold (which did not exist). (Wilson Depo., at ⸿⸿ 18:14-19:3, 20:17-24.)

31. Plaintiff's medical records show that his headaches and dizziness could have stemmed from hypertension, chronic musculoskeletal pain, sleep disorder, and an October 2019 ear infection, all of which can cause Plaintiff's symptoms. (Ugwueze Decl., at ⸿⸿ 8-14.)

32. Plaintiff's medical records also revealed Plaintiff repeatedly refused hypertension treatment and refused to monitor his blood pressure. (Ugwueze Decl., at ⸿⸿ 8-14.)

33. Plaintiff was transferred to the prison's Triage & Treatment Area on October 7, 2019 for dizziness, throbbing of the right temple, and hearing loss, which correlate to his documented hypertension and ear infection, and when he followed up with a physician's assistant on October 16, 2019, Plaintiff denied excessive thirst, urination, and heat or cold intolerance. (Ugwueze Decl., at ⸿⸿ 11-12.)

34. Plaintiff's medical records do not show any evidence that Plaintiff was exposed to black mold between 2019 and 2023. (Ugwueze Decl. at ⸿⸿ 15-19.)

35. Plaintiff testified at his deposition that the heat helped his disc bone disease. (Wilson Depo., at 18:11-18.)

36. Since Dr. Ugwueze's tenure as SATF's Chief Medical Executive beginning in 2013, he has never been aware of any environmental testing or medical determination that toxic mold was present anywhere in the prison. (Ugwueze Decl., at ⸿ 19.)

37. Defendants Collins, Rocha, Sherman, and Smith either reviewed or investigated Plaintiff's heat-related complaints and found Facility B, Building 1 in compliance with OP 207. (Collins Decl., at ⸿⸿ 4-8; Rocha Decl., at ⸿⸿ 5-9; Sherman Decl., at ⸿⸿ 5-11; Smith Decl., at ⸿⸿ 4-8.)

38. Defendant Rocha personally interviewed officers and reviewed heat logs confirming

21

compliance with OP 207. (Rocha Decl., at ¶¶ 5-9.)

39. Defendants Cisneros, Morales, Phillips, and Smith reviewed Florez's inspection records and Plaintiff's grievances, finding no existence of black mold. (Cisneros Decl., at ¶¶ 5-10; Morales Decl., at ¶¶ 4-6; Phillips Decl., at ¶¶ 4-7; Smith Decl., at ¶¶ 4-10.)

40. Defendants Lines, Leahy, and Williams had no knowledge of or involvement with Plaintiff's complaints. (Lines Decl., at ¶¶ 4-9; Leahy Decl., at ¶¶ 4-7; Williams Decl., at ¶¶ 4-8.)

41. Plaintiff may have mistaken Defendant Lines for a different person. (Lines Decl., at ¶¶ 4-9.)

42. Plaintiff petitioned for writ of habeas corpus on June 24, 2020 in the Kings County Superior Court. (Defs.' Req. Jud. Not., Exh. A.)

43. Plaintiff named Defendants Collins, Leahy, Lines, Rocha, Sherman, and Williams, alleging that they and others violated his Eighth Amendment rights by exposing him to extreme heat and humidity without air conditioning, coolers, and ventilation. (RJN, Exh. A.)

44. Plaintiff alleged that ice and cold water were never provided for relief. (RJN, Exh. A.)

45. The Attorney General's Office filed an informal response brief disputing Plaintiff's allegations and attaching OP 207 and 2019 heat temperature logs. (RJN, Exh. B.)

46. On December 14, 2020, the Kings County Superior Court issued an order on the merits, dismissing Plaintiff's petition. (RJN, Exh. C.)

47. The Kings County Superior Court held that Defendants were not deliberately indifferent, noting that CDCR responded to Plaintiff's grievances, initiated repairs to coolers and fountains, and provided fans and ice water even when building temperatures remained below 90 degrees. (RJN, Exh. C.)

(Doc. 81-2.)

## VII.    FINDINGS REGARDING UNDISPUTED FACTS

In ruling on the cross motions for summary judgment and in its recitation of the undisputed facts below, the Court has only considered the evidence that is determined to be

admissible and not in dispute.[12] Where these findings include reference to evidence to which a party has objected, the objection is impliedly overruled. The Court declines to rule on objections to evidence on which it did not rely.[13]

The undersigned identifies the following facts as undisputed (UDF):

1. At all times relevant to the Second Amended Complaint, Plaintiff was an inmate in the custody of the CDCR and was housed at the SATF in Corcoran, California.

2. Plaintiff was housed in Facility B, Building 1 of SATF, assigned to the lower tier.

3. Facilities A and B of SATF have a dormitory design and are part of the same complex—Complex I. Facilities A and B have the exact same layout and each facility has three buildings. Each building has three "pods" identified as A, B, and C. Each pod has two tiers (upper and lower level) and each tier is divided into three "quads" holding seven bunk beds that accommodate fourteen inmates.

4. Pursuant to *Coleman v. Newsom*, Eastern District of California Case No. CIV-S-90-0520, SATF enacted an Institutional Heat Plan via Operational Procedure No. 207 (OP 207) to identify inmates who are, or who may be, susceptible to heat-related illnesses and provide measures to prevent heat-related illnesses.

5. Heat risk inmates are defined as those prescribed any of the medications listed on the Heat Alert Medication List in all forms or strengths.

6. Under OP 207, both outside and inside temperatures are monitored from May 1 through October 31 of each year.

---

[12] *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations); *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007) (a party may not rely on speculative or conclusory testimony contained within affidavits, pleadings, or moving papers to raise a genuine dispute of material fact to defeat summary judgment); *Nelson v. Pima Cmty. Coll*., 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Coverdell v. Dep't of Soc. & Health Servs*., 834 F.2d 758, 762 (9th Cir. 1987) (recitations of unsworn factual allegations do not adequately oppose competent evidence presented in a motion for summary judgment); *Burch v. Regents of Univ. of California*, 433 F. Supp.2d 1110, 1119 (E.D. Cal. 2006) ("statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment" (emphasis omitted)).

[13] "In motions for summary judgment with numerous objections, it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." *Capitol Records, LLC v. BlueBeat, Inc*., 765 F. Supp.2d 1198, 1200 n.1 (C.D. Cal. 2010) (citation omitted).

23

7. Stage I of the Heat Plan only concerns outside air temperature readings and is implemented when outside temperatures reach 90 degrees.

8. Stage II of the Heat Plan activates when indoor temperatures reach 90 degrees.

9. When Stage II of the Heat Plan is implemented, a Correctional Food Manager or Supervising Correctional Cook must deliver containers of iced water to the housing units for inmates identified as heat-risk inmates.

10. And when the inside recorded air temperature of the housing unit is 90 degrees or more, heat-risk inmates must be afforded access to showers and/or spray bottle misting.

11. When the dayroom air temperature of a facility's housing unit reaches 90 degrees Fahrenheit and goes into Stage II Heat Alert, one floor fan will be placed in each dayroom section.

12. The Heat Plan required the inside air temperature of each non-air-conditioned housing unit be recorded on the highest tier to which a heat-risk inmate was assigned, using an accurate thermometer.

13. The Heat Plan also required the inside air temperature be monitored and logged every three hours on an Inside Temperature Record Log (CDCR form 2031).

14. On June 6, 2019, Plaintiff sought interviews with prison officials to address extreme temperatures and ventilation, swamp coolers, and cooling measures.

15. On June 12, 2019, following submission of a health request, Plaintiff was treated for dizziness and severe tension headaches and requested cooling measures.

16. On January 23, 2023, Plaintiff filed a health care request form seeking cough drops and antibiotics due to rain causing "black mold to infect A-Sec. or by virus." The medical provider prescribed medication to treat sore throat and cough.

17. According to the heat logs for Plaintiff's assigned housing unit, the inside temperature did not reach or exceed the 90-degree threshold.

18. Stage II of the Heat Plan was never activated and cooling measures would not have been required for heat-risk inmates housed in Plaintiff's assigned housing unit.

24

19. During the relevant period, Facility B, Building 1's evaporative coolers were functioning at the manufacturer's designed criteria guidelines and the ideal temperatures for the housing units ranged from 68 to 89 degrees.

20. The drinking fountains were also working properly.

21. In the summer of 2019, swamp coolers and igloo containers with ice water were provided to the inmates as a courtesy during repairs despite temperatures not reaching 90 degrees.

22. The Heat Plan was consistently followed during the relevant time period and Plaintiff's building did not pose a threat to his health/

23. Several maintenance work orders in Facility B, Building 1 were fulfilled during the relevant timeframe.

24. On March 12, 2019, a work order was issued to fix vents that were blowing hot air. This repair was completed on March 27, 2019.

25. On May 31 and July 26, 2019, respectively, work orders were issued to fix ventilation issues. These repairs were completed on August 7, 2019.

26. On May 16, 2019, a work order was issued to fix cold water pushbuttons for the building's plumbing. This repair was completed on May 28, 2019.

27. On August 31, 2020, a work order issued to fix the building's HVAC, which was completed on September 17, 2020, due to some parts being out of stock.

28. In August 2022, in response to Plaintiff's grievance about black mold, Defendant Florez, who is an Associate Hazardous Materials Specialist, inspected the first tier of Facility B, Building 1.

29. Defendant Florez discovered that what was perceived as black mold was mildew created from dust and moisture mixing together.

30. On or about November 23, 2022, Defendant Florez inspected the building's showers and did not find any black mold, only soap scum.

31. Defendant Florez has also completed regular testing for black mold since 2015, which have all come back negative, and he has found no evidence of such mold at the prison.

32. In 2019, Plaintiff was not prescribed any medication listed in OP 207's Heat Alert Medication List.

33. Plaintiff testified at his deposition that he did not know if his symptoms were caused by heat or mold.

34. Plaintiff's medical records show that his headaches and dizziness could have stemmed from hypertension, chronic musculoskeletal pain, sleep disorder, and an October 2019 ear infection, all of which can cause Plaintiff's symptoms.

35. Plaintiff's medical records also revealed Plaintiff repeatedly refused hypertension treatment and refused to monitor his blood pressure.

36. Plaintiff was transferred to the prison's Triage & Treatment Area on October 7, 2019 for dizziness, throbbing of the right temple, and hearing loss, which correlate to his documented hypertension and ear infection, and when he followed up with a physician's assistant on October 16, 2019, Plaintiff denied excessive thirst, urination, and heat or cold intolerance.

37. Plaintiff's medical records do not show any evidence that Plaintiff was exposed to black mold between 2019 and 2023.

38. Plaintiff testified at his deposition that the heat helped his disc bone disease.

39. Defendants Collins, Rocha, Sherman, and Smith either reviewed or investigated Plaintiff's heat-related complaints and found Facility B, Building 1 in compliance with OP 207.

40. Defendant Rocha personally interviewed officers and reviewed heat logs confirming compliance with OP 207.

41. Defendants Cisneros, Morales, Phillips, and Smith reviewed Florez's inspection records and Plaintiff's grievances, finding no existence of black mold.

42. Defendants Lines, Leahy, and Williams had no knowledge of or involvement with Plaintiff's complaints.

43. Plaintiff may have mistaken Defendant Lines for a different person.

44. Plaintiff petitioned for writ of habeas corpus on June 24, 2020 in the Kings County

26

Superior Court.

45. Plaintiff named Defendants Collins, Leahy, Lines, Rocha, Sherman, and Williams, alleging that they and others violated his Eighth Amendment rights by exposing him to extreme heat and humidity without air conditioning, coolers, and ventilation.

46. Plaintiff alleged that ice and cold water were never provided.

47. The Attorney General's Office filed an informal response brief disputing Plaintiff's allegations and attaching OP 207 and 2019 heat temperature logs.

48. The Kings County Superior Court held that Defendants were not deliberately indifferent, noting that CDCR responded to Plaintiff's grievances, initiated repairs to coolers and fountains, and provided fans and ice water even when building temperatures remained below 90 degrees.

## VIII.    DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Defendants request that the Court take judicial notice of the following:

1.  A Petition for Writ of Habeas Corpus filed by Plaintiff David W. Wilson on June 24, 2020, in the California Superior Court for the County of Kings, Case No. 20W0035D (Exhibit A);

2.  An Informal Response filed by the Office of the Attorney General on October 20, 2020, in the California Superior Court for the County of Kings, Case No. 20W0035D (Exhibit B); and

3.  An Order dated December 14, 2020, denying Plaintiff's Petition for Writ of Habeas Corpus, issued by the California Superior Court for the County of Kings, Case No. 20W0035D (Exhibit C).

(Doc. 81-3.)

Rule 201 of the Federal Rules of Evidence regarding  adjudicative facts, provides as follows:

> **(a) Scope**. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.
>
> **(b) Kinds of Facts That May Be Judicially Noticed**. The court may judicially notice a fact that is not subject to reasonable dispute

27

because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**(c) Taking Notice**. The court: (1) may take judicial notice on its own; or (2) must take judicial notice if a party requests it and the court is supplied with the necessary information. (d) Timing. The court may take judicial notice at any stage of the proceeding.

Fed. R. Evid. 201 (a)-(c).

Defendants request that the Court take judicial notice of the petition, informal response, and order in Kings County Superior Court case number 20W0035D is granted *except* for a single page from Exhibit B. Other than the single page addressed below, the documents meet the requirements of Rule 201 because they can be accurately and readily determined from a source whose accuracy cannot be reasonably questioned. Fed. R. Evid. 201(b)(2).

The Court declines to take judicial notice of page 121. This single page document appears to have been inadvertently included between page 120 and page 122 which relate to consecutive pages in the Institution Heat Plan, while page 121 relates to a separate matter titled *People v. Robert Curtis Williams*. Page 121 relates to a request for copies directed to the Kings County Superior Court by the Fresno County District Attorney's Office.

In sum, the Court takes judicial notice of Exhibit A (Doc 81-3 at 3-102), Exhibit B excepting page 121 (*id*. at 103-120 & 122-147), and Exhibit C (*id*. at 148-152). Fed. R. Evid. 201; *see Harris v. County of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012) (court may take judicial notice of "documents on file in federal or state courts").

### IX.   DISCUSSION

#### *Plaintiff's Claims Concerning Ventilation and Cooling Are Barred By Res Judicata*

##### The Applicable Standards

The purpose of claim preclusion[14] or res judicata is "[t]o preclude parties from contesting matters that they have had a full and fair opportunity to litigate," which serves to protect against

---

[14] *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 412 (2020) (noting that claim preclusion is sometimes called res judicata).

"the expense and vexation attending multiple lawsuits, conserve[ ] judicial resources, and foster[ ] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153-54 (1979). Claim preclusion applies in civil cases like section 1983 actions. *United States v. Bhatia*, 545 F.3d 757, 759 (9th Cir. 2008) (noting that claim preclusion applies in civil proceedings); *Ewing v. Superior Ct. of California*, 90 F.Supp.3d 1067, 1075 (S.D. Cal. 2015) (noting that claim preclusion applies in § 1983 actions).

"Under the doctrine of claim preclusion, a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Put another way, "[c]laim preclusion bars a party in successive litigation from pursuing claims that were raised or could have been raised in a prior action." *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1020 (9th Cir. 2019) (quotation marks & internal alterations omitted). Claim preclusion "applies when the earlier suit (1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005) (internal alterations & quotation marks omitted).

The party seeking to apply claim preclusion bears the burden of establishing the following: (1) an identity of claims; (2) the existence of a final judgment on the merits; and (3) identity or privity of the parties. *See Cell Therapeutics, Inc. v. Lash Group, Inc.*, 586 F.3d 1204, 1212 (9th Cir. 2009); *see also Headwaters, Inc. v. U.S. Forest Service*, 399 F.3d 1047, 1052 (9th Cir. 2005).

The Court employs four criteria to determine whether claims are identical: "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transaction nucleus of facts." *Harris*, 682 F.3d at 1132 (internal quotation marks & citation omitted). "The fourth criterion is the most important." *Id*.

Plaintiff "cannot avoid the bar of res judicata merely by alleging conduct by the defendant not alleged in his prior action or by pleading a new legal theory." *McClain v. Apodaca*, 793 F.2d

29

1031, 1034 (9th Cir. 1986), citing *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir.), cert. denied, 459 U.S. 1087 (1982).

Analysis

Defendants contend Plaintiff's complaint relitigates the same primary right he asserted in the petition for writ of habeas corpus he filed in the Kings County Superior Court where he alleged Defendants Sherman, Williams, Lines, Rocha, Leahy, Collins and others violated his Eighth Amendment rights by exposing him to extreme heat and humidity due to a lack of air conditioning, coolers, and ventilation, and that staff failed to provide cooling measures such as ice and cold water. Defendants contend that both suits "arise from the same alleged injury, during the same timeframe, and at the same facility." Next, Defendants contend the habeas petition and this action involves the same Defendants, establishing privity of the parties. Finally, Defendants contend the action in Kings County Superior Court resulted in a final order on the merits. Specifically, the state superior court found Defendants were not deliberately indifferent because Plaintiff's grievances were responded to, repairs to coolers and fountains were initiated, and inmates were provided with fans and ice water even when building temperatures remained below the 90 degree threshold.

The Court has reviewed the judicially noticed documents. First, Plaintiff's habeas petition alleges "Eighth Amendment cruel and unusual punishment for inhumane conditions of confinement" due to "Extreme HEAT," referencing a lack of filters and adequate ventilation or air conditioning, a denial of portable swamp coolers, and correctional staff's denial of "Cooling Measures" like ice and "working COLD" water fountains. (*See* Doc. 81-3 at 6, 10-25.) Therefore, habeas petition filed in Kings County involves "the same 'claim' or cause of action" as that presented in this action. *Mpoyo*, 430 F.3d at 987; *Cell Therapeutics, Inc.*, 586 F.3d at 1212.

Next, the Kings County Superior Cour issued an Order Re: Petition for Writ of Habeas Corpus. (Doc. 81-3 at 149-152.) The state court denied the petition as follows:

> While Petitioner alleges certain guards have locked themselves up in cool offices, leaving inmates to suffer in warmer temperatures, the documentation also makes fairly evident that CDCR has listened to his concerns, responded to his grievances, and initiated repairs to coolers and fountains in building B1 to ensure the inmates housed

30

> there are not subjected to insufferable conditions. In fact, the Second Level Response attached to the Petition indicates that building B1 was at times provided fans and ice water even though temperature readings taken regularly by staff never reached the 90-degree threshold under the Heat Plan for doing so.
>
> This court finds that the Petition fails to allege facts sufficient to show the existence of a substantial risk of serious harm to Petitioner due to heat conditions in building B1 and also fails to make a sufficient factual showing that Respondent acted with deliberate indifference in addressing any heat-related issues in Petitioner's building.

(Doc. 81-3 at 151.) Thus, the habeas petition filed in Kings County "reached a final judgment on the merits." *Mpoyo*, 430 F.3d at 987; *Cell Therapeutics, Inc.*, 586 F.3d at 1212; *Gonzalez v. California Department of Corrections*, 739 F.3d 1226, 1231 (9th Cir. 2014) (in California, a "reasoned denial" of a habeas petition is preclusive).

Plaintiff's habeas petition also names Stuart Sherman, Amber Williams, Jan Lines, S. Leahy, E. Rocha, S. Marsh, and Jason Collins as Respondents. (*See* Doc. 81-3 at 4, 10.) Those individuals are also named as Defendants in this action, making them "identical parties" in both actions. *Mpoyo*, 430 F.3d at 987; *Cell Therapeutics, Inc.*, 586 F.3d at 1212. And while Defendants Cisneros, Florez, Morales, Phillips, and Smith were not identified in Plaintiff's habeas petition, those individuals are in privity with the others as officials or employees of CDCR. *Id.*; *Furnace v. Giurbino*, 838 F.3d 1019, 1028 (9th Cir. 2016) (affirming summary judgment and holding that "because Furnace's suit involves '(1) the same cause of action (2) between the same parties [or parties in privity with them] (3) after a final judgment on the merits in the first suit,'" claim preclusion bars later section 1983 action); *Cox v. Kernan*, No. 2:19-cv-01637 JAM DB, 2021 WL 3783911, at *4 (E.D. Cal. Aug. 26, 2021) ("When parties are agents of the same government, they are in privity").

The undersigned's review reveals that the "rights or interests established in the prior judgment would be destroyed or impaired by prosecution" of this action, "substantially the same evidence" was or is presented both actions, both "suits involve infringement of the same [Eighth Amendment] right" and "arise out of the same transaction nucleus of facts" occurring in 2019. *Harris*, 682 F.3d at 1132.  To the extent Plaintiff contends these claims are not barred by res

31

judicata "for breach of primary right and duty & harm suffered," his contention is not persuasive because, as explained above, the state court action involved a final judgment on the merits on the same claims against the same defendants and those in privity with them. *Taylor*, 553 U.S. at 892; *McClain*, 793 F.2d at 1034.

In sum, Plaintiff should be precluded from contesting the Eighth Amendment conditions of confinement claims that arose in 2019 regarding ventilation and cooling because he had a full and fair opportunity to litigate those claims in the Kings County Superior Court. *Montana*, 440 U.S. at 153-54; *Taylor*, 553 U.S. at 892; *Ewing*, 90 F.Supp.3d at 1075.

### *Plaintiff Has Not Established that the Conditions Posed a Substantial Risk of Serious Harm to His Health*

A prisoner pursuing an Eighth Amendment conditions of confinement claim must establish both an "objective component" and a "subjective component." *Farmer*, 511 U.S. at 834. The objective component relates to the seriousness of the challenged conditions while the subjective component speaks to the state of mind of the officials responsible for the alleged violation. *Id.*; *see also Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "High temperatures accompanied by inadequate cooling or other heat-related accommodations for prisoners can in some circumstances constitute an objectively, serious conditions of confinement." *Cannon v. Gallagher*, No. 1:18-cv-00666-JLT-HBK, 2022 WL 977035, at *10 (E.D. Cal. Mar. 31, 2022).

### Extreme Temperatures

Defendants have presented evidence that outside and indoor temperatures are monitored from May 1 through October 31 each year under OP 207. UDF 4 & 6. Stage I of the Heat Plan addresses the outside air temperature readings and is implemented when outside temperatures reach 90 degrees. UDF 7. Stage II of the Heat Plan activates when indoor temperatures — monitored and logged every three hours—reach 90 degrees. UDF 8 & 13. When Stage II is implemented, containers of ice water are delivered to the housing units for inmates identified as heat-risk inmates, and when the indoor temperature exceeds 90 degrees or more, those inmates are to be given access to showers and/or spray bottle misting. UDF 9, 10. When a housing unit dayroom temperature exceeds 90 degrees, Stage II requires one floor fan to be placed in the

dayroom section. UDF 11. Defendants have also presented evidence that during the relevant period,[15] the temperature in Plaintiff's building did not reach or exceed 90 degrees.[16] UDF 17. As a result, Stage II of the Heat Plan was never activated for heat-risk inmates housed in Plaintiff's building. UDF 18. Moreover, Defendants have presented evidence that evaporative coolers and drinking fountains were working properly. UDF 19 & 20. In the summer of 2019, swamp coolers and containers of ice water were provided to inmates during repairs[17] as a courtesy despite indoor temperatures of less than 90 degrees. UDF 21.

Defendants have also presented evidence that Plaintiff was not a heat-risk inmate because he was not prescribed a medication on the Heat Alert Medication List during the relevant period and did not have a pre-existing medical condition that increased the risk of a heat-related illness. UDF 5 & 32. During his deposition of April 9, 2025, Plaintiff testified he did not have a medical condition that made him at greater risk of heat related illness and was not prescribed heat meds.[18] (*See* Doc. 81-21 at 12-13, 15-16.)

Defendants have also presented evidence that Plaintiff's dizziness and headaches may have stemmed from hypertension, chronic musculoskeletal pain, sleep disorder, and an ear infection. UDF 33 & 34. Plaintiff repeatedly refused treatment for hypertension and refused blood

[15] The Heat Plan Coordinator was unable to locate the indoor temperature log for August 26 through September 1, 2019. (*See* Doc. 81-6 at 3, ¶ 6.) Although the indoor temperature log for this one-week period is missing, because the remainder of the temperature logs reveal the indoor temperature never exceeded the 90-degree threshold, even presuming the missing log included such temperatures, the duration is insufficient to establish a substantial risk of serious harm. *Anderson*, 45 F.3d at 1314-15. Notably too, during the period between August 26 and September 1, 2019, the indoor temperature logs for Building 1's neighbor, Unit A, Buildings 1, 2 and 3, reveal the highest indoor temperature recorded as follows: 85 degrees on August 27, 2019, in Unit A, Building 1 (Doc. 81-6 at 63); 81 degrees on August 29, 2019, in Unit A, Building 2 (*id*. at 64), and 82.4 degrees on August 27 and 28, 2019, in Unit A, Building 3 (*id*. at 65).

[16] The highest temperature recorded during the relevant period was 85 degrees on July 24, 25 and 26, and August 25, 2019. (*See* Doc. 81-6 at 48, 52.)

[17] During the relevant period, repairs were completed concerning vents blowing hot air (work order of 3/12/19; completed 3/27/19); ventilation issues (work orders of 5/31/19 & 7/26/19; completed 8/7/19); and HVAC repairs (work order of 8/31/20; completed 9/17/20).

[18] Although Plaintiff was previously prescribed Haldol, a medication on the Heat Med list, he stopped taking that medication "about February 2019," prior to the relevant period. (Doc. 81-21 at 12, 16.)

33

pressure monitoring. UDF 35. And after treatment on October 7, 2019, when Plaintiff complained of dizziness, throbbing of the right temple, and hearing loss, at a follow up appointment of October 16, 2019, he denied excessive thirst, urination, or intolerance to heat or cold. UDF 36.

Defendants have met their initial burden of demonstrating there is no genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A). The burden thus shifts to Plaintiff to establish that a genuine issue of material fact exists. *Matsushita*, 475 U.S. at 586.

First, to the extent Plaintiff's opposition to Defendants' summary judgment motion relies solely on the allegations asserted in the operative complaint, such reliance is insufficient to meet his burden of production. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586, n.11. Stated another way, the fact the Court found Plaintiff stated plausible claims after screening the complaint does not amount to evidence upon which Plaintiff can rely in opposing summary judgment.

Plaintiff argues the temperatures are not "being done correctly" and are inaccurate because they are "NOT Digital," and when digital thermometers are used, "the Temperature is 10 degrees more." Plaintiff fails to present *evidence* that the temperatures recorded during the relevant period are inaccurate or even that the device used to record indoor temperatures is not digital. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The fact that Plaintiff filed grievances concerning the temperatures in his building and asserted that staff were not compliant with the Heat Plan does not create a genuine dispute of material fact that extreme temperatures existed. *See Cafasso*, 637 F.3d at 1061 ("a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations"); *Soremekun*, 509 F.3d at 984 (a party may not rely on speculative or conclusory testimony contained in moving papers to raise a genuine dispute of material fact to defeat summary judgment); *Nelson*, 83 F.3d at 1081-82 (mere allegations and speculation are insufficient). And Plaintiff's belief that the temperatures recorded in his building are inaccurate is not evidence that Plaintiff faced a serious risk of substantial harm. *Id*. Plaintiff offers nothing more than "some metaphysical doubt" and on this record a rational trier of fact would not find for Plaintiff. *Matsushita*, 475 U.S. at 587.

Nor has Plaintiff offered evidence to overcome that offered by Defendants' concerning evaporative coolers, swamp coolers, drinking fountains or ice provided to inmates. *Cafasso*, 637

F.3d at 1061; *Soremekun*, 509 F.3d at 984; *Nelson*, 83 F.3d at 1081-82. Plaintiff has not countered Defendants' evidence that Plaintiff was not a heat-risk inmate and had no pre-existing medical condition that increased the risk of a heat-related illness. *Id*. Further, Plaintiff has offered no evidence to indicate that his dizziness or headaches or other alleged physical symptoms were caused by extreme temperatures. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.

### Black Mold[19]

Defendants have presented evidence that black mold did not exist in Building 1 threatening Plaintiff's health and safety. Specifically, Defendants have presented evidence that investigations of Building 1 facilities were performed in August and November 2022 and that mildew and soap scum were present, but no black mold was found. UDF 28-30. Defendants' evidence also indicates SATF's associate hazardous materials specialist[20] has found no evidence of black mold, and regular testing for black mold at SATF has been negative since 2015. UDF 31.

Defendants have met their initial burden of demonstrating there is no genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A). The burden thus shifts to Plaintiff to establish that a genuine issue of material fact exists. *Matsushita*, 475 U.S. at 586.

As discussed below, Plaintiff's reliance solely on the allegations asserted in the operative complaint is insufficient to meet his burden of production. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586, n.11.

Plaintiff contends he has established "Black Mold from 2019 through 2025," asserting Defendants have "painted-over" toilets and showers but the black mold "comes back." He maintains it is "seen behind Back Wall-Lockers" and has not been abated, presenting a health hazard. Plaintiff argues that "to claim [mildew] is not correcting Health [Hazard] and for the Defendant Florez's only opinion without Swabs, Scraping Samples, and Timed Air-Samples by

---

[19] "Mold is a microorganism and type of fungus that thrives in wet places. … Molds and mildews are related, but distinct, types of fungi. Mold [] tends to be fuzzy, thicker, and greenish or black in color. Mildew [] is typically powdery and rests flat on surfaces." *See* https://www.niehs.nih.gov/health/topics/agents/mold, as of 4/7/2026.

[20] This individual "gained technical experience in hazardous materials, safety, and quality assurance" during 20 years of service with the United States Navy, has received a certificate of training at the OSHA Training Institute Education Center concerning hazardous waste operations and emergency response, and received on-site training at Wasco State Prison "for air sampling." (*See* Doc. 81-18 [Declaration of F. Florez].)

independent Industrial [Hygienist], is not a dispute but Required for Health and Safety."

Plaintiff again fails to present *evidence* that black mold was present in Building 1 during the relevant period. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The fact Plaintiff filed grievances asserting the presence of black mold does not create a genuine dispute of material fact that black mold was present. *See Cafasso*, 637 F.3d at 1061; *Soremekun*, 509 F.3d at 984; *Nelson*, 83 F.3d at 1081-82. And Plaintiff's belief that the black mold rather than mildew was present in Building 1 is not evidence that Plaintiff faced a serious risk of substantial harm. *Id*.; *see also*, *e.g.*, *Wilson v. Osborne*, No. 4:09CV-P82-M, 2010 WL 4024807, at *2-3 (W.D. Ky. Oct. 13, 2020) (granting summary judgment and holding "Defendant has shown by his affidavit and other documents attached to his motion for summary judgment that he has complied with his duty under the Eighth Amendment to ensure the 'reasonable safety' of the inmates at DCDC regarding risk from fire and from mold; therefore, there is no Eighth Amendment violation" and that "Plaintiff has failed to refute Defendant's argument and has also failed to demonstrate the existence of genuine issues of material fact"); *Scott v. Orange County Jail*, No. 1:16CV1249, 2019 WL 332198, at *3 (M.D.N.C. Jan. 25, 2019) (granting summary judgment, in part, concerning Scott's claim of exposure to black mold exposure and noting the "record evidence stands uncontradicted, because Plaintiff's Complaint and summary judgment-related filings do not qualify as evidence"). Plaintiff offers nothing more than "some metaphysical doubt" concerning the presence of black mold and on this record a rational trier of fact would not find for Plaintiff. *Matsushita*, 475 U.S. at 587.

Plaintiff's contention that Defendant Florez's declaration is suspect because he purportedly did not swab or sample the areas in Building 1 does not overcome Defendants' evidence. Florez is a hazardous materials specialist with training and experience in this area while Plaintiff has alleged no such experience.[21] *See* Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is (a) rationally based on the

---

[21] *See also Lemire*, 726 F.3d at 1078 ("[O]bviousness is not measured by what is obvious to a layman, but rather by what would be obvious in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved").

witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *See, e.g.*, *Green v. Shirley*, No. 1:23-cv-00505-JLT-EPG (PC), 2025 WL 2808434, at *10 (E.D. Cal. Oct. 2, 2025) ("Plaintiff is not an expert and may not give an opinion on the dangers posed by the TCP levels in WSP's water"); *Wilkins v. Barber*, No. 2:19-cv-1338 WBS KJN P, 2023 WL 1111657, at *17 (E.D. Cal. Jan. 30, 2023) ("Plaintiff must present competent evidence demonstrating that the doctors' progress notes are false in material respects as related to the elements of his Eighth Amendment claims. Here, there is no evidence that the doctors did not see plaintiff as indicated in treatment notes, or that the doctors did not pursue the course of treatment reflected in such records. Plaintiff claims generally that such doctors failed to "examine" or "evaluate" plaintiff or disputes the doctor's observations recorded in the notes. But plaintiff's general and conclusory contentions are insufficient to create a genuine dispute regarding whether defendant doctors treated plaintiff as described in their medical notes. In addition, the court is not required to accept plaintiff's self-serving statements where they are contradicted by such doctor's declarations and medical records, as well as the medical records of other medical staff and specialists, and test results"); *Carroll v. Yates*, No. 1:10-cv-00623-LJO-SKO PC, 2013 WL 100237, at *15 (E.D. Cal. Jan. 7, 2013) (recommending plaintiff's summary judgment be denied and defendants' summary judgment be granted, and noting in part that plaintiff "is limited to testifying as to issues which are within his personal knowledge and to which expertise is not required"), aff'd on appeal, *Carroll v. Dutra*, 564 Fed. App'x 327 (9th Cir. Mar. 18, 2014).

For the same reasons discussed above, Plaintiff's summary judgment motion does not contain sufficient information for a jury to reasonably render a verdict in his favor on the question of whether extreme temperatures and black mold at SATF posed a substantial risk of serious harm. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11, 587; *Cafasso*, 637 F.3d at 1061; *Soremekun*, 509 F.3d at 984; *Nelson*, 83 F.3d at 1081-82. Here, because Plaintiff fails to support his allegations with sufficient evidence, the factual disputes claimed by Plaintiff do not require a jury or judge to resolve differing versions of truth. *T.W. Elec. Serv.*, 809 F.2d at 631.

**Summary**

For the foregoing reasons, the undersigned will recommend that Defendants' summary judgment motion be granted and Plaintiff's summary judgment motion be denied on the subjective component of the deliberate indifference test. *Farmer*, 511 U.S. at 834.

***Plaintiff Has Not Established that Defendants Were Aware of an Excessive Risk to His Health***

As discussed above, a prisoner pursuing an Eighth Amendment conditions of confinement claim must establish both an "objective component" and a "subjective component." *Farmer*, 511 U.S. at 834. The objective component relates to the seriousness of the challenged conditions while the subjective component speaks to the state of mind of the officials responsible for the alleged violation. *Id.*; *Wilson*, 501 U.S. at 298.

Defendants have presented evidence that following reviews or investigations by Defendants Collins, Rocha, Sherman, and Smith concerning Plaintiff's excessive heat complaints in Building 1, it was determined that SATF complied with OP 207 as concerned facility temperatures during the relevant period. UDF 39 & 40. Additionally, Defendant Florez's inspections in 2022 found no black mold. UDF 28-31. Defendants have also presented evidence that Defendants Cisneros, Morales, Phillips, and Smith reviewed Florez's inspection records and Plaintiff's grievances, and concluded black mold was not present. UDF 41. Further, Defendants' evidence indicates Defendants Lines, Leahy, and Williams had no knowledge of or involvement with Plaintiff's complaints concerning extreme temperatures. UDF 42 & 43.

Defendants have met their initial burden of demonstrating there is no genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A). The burden thus shifts to Plaintiff to establish that a genuine issue of material fact exists. *Matsushita*, 475 U.S. at 586.

To the extent Plaintiff's opposition to Defendants' summary judgment motion relies solely on the allegations asserted in the operative complaint, this is insufficient to meet his burden of production. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586, n.11.

Plaintiff contends he "has met the two prong showing of Eighth Amendment violation," including the subjective component, and cites to the various grievances (and related exhibits) that

38

he submitted. However, Plaintiff fails to present evidence that Defendants were aware that extreme temperatures and the presence of black mold in Building 1 presented an excessive risk to his health. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. Once again, the fact Plaintiff filed grievances asserting extreme temperatures and the presence of black mold does not create a genuine dispute of material fact speaking to the merits of Plaintiff's claims.[22] *See Cafasso*, 637 F.3d at 1061 (a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations); *Soremekun*, 509 F.3d at 984 (a party may not rely on speculative or conclusory testimony contained within affidavits, pleadings, or moving papers to raise a genuine dispute of material fact to defeat summary judgment); *Nelson*, 83 F.3d at 1081-82 ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

Plaintiff has not shown that prison officials acted with deliberate indifference. *Wilson*, 501 U.S. at 303; *Labatad*, 714 F.3d at 1160. Defendants' evidence reveals they were not aware of any indoor temperature exceeding 90 degrees in Building 1 that would require activation of Stage II procedures or present a danger to Plaintiff; and although Plaintiff believes black mold was present, Defendants' evidence indicates only mildew and soap scum were present in SATF's Building 1. *Farmer*, 511 U.S. at 837; *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1081-82 (9th Cir. 2013). This record establishes that those Defendants who investigated and/or reviewed Plaintiff's complaints concerning extreme temperatures and the presence of black mold reasonably responded to Plaintiff's concerns. *Farmer*, 511 U.S. at 844-45 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. … Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause"). In short, Plaintiff has failed to meet the high standard required of him. *Toguchi*, 391 F.3d at 1060.

---

[22] The filing of grievances was relevant to a determination of whether Plaintiff exhausted his administrative remedies concerning these claims. As previously noted, the exhaustion issue has since been resolved.

For the same reasons discussed above, Plaintiff's summary judgment motion does not contain sufficient information for a jury to reasonably render a verdict in his favor on the question of whether Defendants acted with deliberate indifference. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11, 587. Because Plaintiff fails to support his allegations with sufficient evidence, the factual disputes claimed by Plaintiff do not require a jury or judge to resolve differing versions of truth. *T.W. Elec. Serv.*, 809 F.2d at 631.

### *The Court Declines to Address Qualified Immunity*

Because the undersigned has found that Defendants are entitled to judgment on the merits, she does not reach Defendants' alternative argument that they are entitled to qualified immunity.

### IX.   CONCLUSION AND RECOMMENDATIONS

For the foregoing reasons, this Court **HEREBY RECOMMENDS** that:

1.  Plaintiff's summary judgment motion (Doc. 61) be **DENIED**;

2.  Defendants' summary judgment motion (Doc. 81) be **GRANTED**; and

3.  That judgment be entered in favor of Defendants, any pending motions be terminated (*see* Docs. 52, 54, 57, 60, 67, 76 & 79), and the action be closed.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **Within 14 days** after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and **shall not exceed fifteen (15) pages** without leave of Court and good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time

//

//

40

may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   **April 15, 2026**                    /s/ *Sheila K. Oberto*
                                        UNITED STATES MAGISTRATE JUDGE